UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION



CASE NO.

FRANCISCO PICHEL

    Plaintiff,

       vs.

CITY OF MIAMI, FLORIDA,
WILLIAM O'BRIEN

    Defendant.

**CIV-MORENO**

**NOTICE OF REMOVAL**

MAGISTRATE JUDGE
DUBÉ

FI' F ¬ by _____ D.C.
DK¬G

NOV 2 0 2001

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. · MIAMI

_____/

    Defendants, the CITY OF MIAMI, et al., by and through the undersigned attorney, pursuant to 28 U.S.C., Section 1441, et seq., hereby give notice of removal of this cause by the filing and service of this notice, and state:

    1.    On October 29, 2001, the City received service of the summons and complaint in this matter, which had been filed in the 11th Judicial Circuit In And For Miami-Dade County, Florida, bearing Case No.: 01-25592 CA 06.

    2.    The receipt of service of the summons and complaint on October 29, 2001, was the first receipt by Defendant of a pleading from which it could first be ascertained that the case is one which is or has become removable, as it sets forth purported claims for relief under federal law, for purposes of 28 U.S.C. Section 1446(b).



**NOTICE OF REMOVAL**

3.    The allegations of the COMPLAINT attempt to allege a claim arising under the laws of the United States, i.e., 42 U.S.C. §1983.  This Court has original jurisdiction over these claims.  There are no state law claims.

4.    Copies of all process, pleadings and orders served upon the Defendant in the action being removed are attached hereto in compliance with 28 U.S.C. Section 1441(a).  To date only the Complaint has been filed.


    **I CERTIFY** that a copy of the foregoing Notice of Removal has been furnished by mail to Miguel M. de la O, Esq., DE LA O & MARKO, P.A., 3001 S.W. Third Avenue, Miami, Florida 33129 on this ___21___ day of November, 2001.


                        Alejandro Vilarello, City Attorney
                        STEPHEN SCOTT, Assistant City Attorney
                        Attorney for City of Miami
                        945 Miami Riverside Center
                        444 Southwest 2nd Avenue
                        Miami, FL  33130-1910
                        Tel.: (305) 416-1800


                    By:    _____
                        Stephen Scott
                        Assistant City Attorney
                        Florida Bar No. 7774235

nremov.doc

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.: 01-25592   CA06

FRANCISCO PICHEL,

     Plaintiff,

vs.

CITY OF MIAMI, FLORIDA,
WILLIAM O'BRIEN,

     Defendants.

_____/

**JURY TRIAL DEMANDED**

THE ORIGINAL FILED

ON OCT 2 6 2001

IN THE OFFICE OF
CIRCUIT COURT DADE CO. FL
CIVIL DIVISION

## COMPLAINT

The Plaintiff, Fransicso Pichel ("Frank Pichel" or "Pichel") sues Defendants, City

of Miami, Florida (the "City"), and William O'Brien ("O'Brien"), and states as follows:

## INTRODUCTION

    1.    The saying, "so and so is a good cop," has become such an overused

and hackneyed Hollywood cliché that people are rightly skeptical of it. But here, it fits:

Sergeant Frank Pichel *is* a good cop. He is, according to the many commendations in

his personnel file, "tireless," "conscientious and dedicated," "caring," an "innovative

problem solver" and an "outstanding leader." But during his almost twenty (20) years of

honorable service, Sgt. Pichel saw a group of officers rise within the Miami Police

Department who were not honorable; to the contrary, this clique of officers was corrupt,

cohesive, powerful and murderously violent, and through their actions, threatened the

lives and rights of the very citizens they were employed to protect.

Case No.

2.     The Police Department and the City knew about this, but in order to avoid scandal and to "protect its own," they covered it up, by ignoring it when they could, sanitizing it when they had to, and washing it clean when it became absolutely necessary.  When police misconduct needed to be whitewashed, the Department ran it through an Internal Affairs "investigation," which is merely a dog-and-pony show to give the public the illusion that police wrongdoing is seriously scrutinized from within.

3.     In reality, Defendants use Internal Affairs investigations to harass, punish and retaliate against inside whistle blowers.

4.     Pichel blew the whistle on the clique's criminal enterprise, and the Department's whitewashing of it, to federal agencies.  This, coupled with his outspoken opposition to Joe Carollo, Donald Warshaw, and William O'Brien, made Pichel a target for retaliation by the Defendants.  In 2000, Defendants found what they believed to be a defensible pretext, and they put Pichel under virtual house arrest while Internal Affairs, to this day, drags its feet in its "investigation" as long as possible.

5.     Tellingly, other officers who have been suspected of similar, or *far worse acts*, have not been relieved of duty.  Indeed, throughout a federal investigation into the clique's conduct in a spate of fatal police shootings, Defendants didn't even assign the subjects of the investigation to desk duty, much less relieve them of duty.

6.     Recently, thirteen (13) members of the clique were arrested on murder charges stemming from the federal investigation.  Other members of the clique are now under investigation.  And Mr. Warshaw was recently sentenced to a year in prison for stealing nearly $70,000.00 from a children's charity that he founded nearly a decade ago.  All of this bears out what Pichel has been saying for years.

Case No.

7.      Pichel's situation, however, has not changed.  Defendants have violated,

and continue to violate, Pichel's right to speak and associate freely, and failed to afford

him equal protection under the law.  Defendants' treatment of Pichel, besides being a

disgrace, is flat unlawful.  Defendants should finally be called to task for it.

## JURISDICTION

8.      This is an action for damages in excess of $15,000, exclusive of interest,

costs, and attorney's fees.

9.      On information and belief, O'Brien is a resident of Monroe County.

10.     This Court has subject matter jurisdiction over the subject matter of this

action, as state courts have concurrent jurisdiction over § 1983 actions against both

individuals and municipalities.

11.     Venue is proper within this circuit, because the claims accrued here.

12.     To the extent he is required by law to do so, Pichel has exhausted his

administrative remedies.  On July 16, 2000, Pichel served a written complaint on the

City of Miami Civil Service Board.  Copies of the complaint and affidavit of service are

attached hereto as Exhibit "A."  The Board approved a motion to deny Pichel's request

for an investigation, ending its inquiry into Pichel's complaint on August 31, 2001.

## FACTUAL BACKGROUND

## I.    PICHEL'S DISTINGUISHED BACKGROUND AS A MIAMI POLICE OFFICER.

13.     Pichel has been a police officer with the City of Miami Police Department

for almost twenty (20) years.  He has been, throughout that time, dedicated, hard

working, and honest, and his efforts have earned him the respect of his community:

Case No.

A.    Pichel was, according to the numerous commendations from his immediate supervisors, "committ[ed] to a high level of productivity" and a "relentless" pursuit of criminals.

B.    Pichel participated in the Wynwood Community Empowerment Anti-Narcotics/Prostitution Initiative, which was designed to loosen the stranglehold that drugs and prostitution had on the Wynwood community.  The initiative was a tremendous success.  In May 1999, for example, the officers in the program confiscated firearms, drug money, cocaine, heroin, marijuana and impounded seventy seven (77) vehicles that generated $77,000.00 in revenue for the City of Miami-Dade County.

C.    In June 1999, Pichel's supervising officer "note[d] with pride that Sergeant Pichel has done an excellent job ensuring we deliver the best possible services to the community.  I see genuine interest and your efforts do not go unrewarded."

D.    On April 29, 1999, the Miami-Dade County chapter of Mothers Against Drunk Driving awarded Pichel its 1998 "Enforcement Award of Honor."  The award honored Pichel for diligently enforcing the laws prohibiting drunk driving, as well as for his enthusiastic support of "sobriety D.U.I. check points," which proved a very effective technique for identifying impaired drivers *before* they caused harm to anyone.

E.    Pichel spearheaded, and served as the lead supervisor in, the Wynwood/Edgewater Community Empowerment Crime and Drug Reduction Program, which targeted children exhausted and suffering from a sense of fear and helplessness as a result of neighborhood crime and economic difficulties.  The program aggressively pursued criminals with a high visibility neighborhood presence.  It was a tremendous success, making well over 2,000 arrests, including 189 felony arrests, intercepting guns

Case No.

and roughly 1,750 grams of drugs having a street value of over one hundred twenty thousand dollars ($120,000.00).  Pichel's supervisor commended his effort: "It is, indeed, a pleasure to recognize this supervisor for his performance during this important and crucial initiative."

F.     In March 1999, Pichel and officers under his supervision caught a prisoner who had escaped from the Krome Service Processing Center.  Alan J. Hazen, the Special Agent in Charge of the Miami Field Office of the U.S. Department of Justice, appreciated Pichel's effort and thanked him for it: "Without your assistance . . . [the escapee] would not have been apprehended that night and still may have been at large among the citizens of Miami."

G.     Pichel and his immediate supervisor, Lt. Mario Garcia, worked with the Miami-Dade Housing Agency to draft the COPS program, whereby off-duty Miami police officers would provide security at MDHA's public housing developments.

H.     At the bottom of a commendation given to several officers, including Pichel, for their outstanding work in prostitution details, *e.g.*, operations to arrest persons who hire prostitutes along Edgewater street corners, Lt. Garcia added the following handwritten note: "Sgt. Pichel is one of the most prolific sergeants in the Miami Police Dept.  Thank you for your leadership!"  Furthermore, in a commendation praising the success of Wynwood/Edgewater Police Neighborhood Enhancement Team, which Pichel helped organize and oversee, Lt. Garcia reiterated his opinion of Pichel's leadership skills: "As a result of the leadership and enforcement efforts of Sgt. Frank Pichel and his officers, incidents involving violent crimes significantly decreased."

I.     In March 1995, in response to a cry for help from a bailiff, Pichel and three officers rushed into Judge Roberto M. Pineiro's courtroom, and administered

Case No.

emergency first aid to someone who had begun to have a heart attack.  On March 27,

1995, Judge Pineiro wrote a letter to the Chief of Police, praising Pichel's clearheaded

and decisive actions, which Judge Pineiro considered "timely" and "possibly life saving."

      J.     On February 29, 1996, Pichel was pursuing a dangerous suspect

who had just robbed offices in a professional building on Biscayne Boulevard and

assaulted a security guard in making his getaway.  The suspect had drawn police into a

long chase on foot through the streets of, and onto the rooftops of some buildings in,

downtown Miami.  Pichel and two officers under his supervision gave chase, and

pursued the suspect into a boarded up building (by entering the rooftop), and eventually

captured him after conducting a perilous floor to floor search.

      K.     Prosecutors from Miami's State Attorney Department have filled

Pichel's personnel file with letters praising his work: "[C]ertain officers . . . routinely

demonstrate an extraordinary degree of proficiency and commitment.  Sergeant Frank

Pichel is such an officer," "Sergent Pichel is one of the greatest assets [to] our DUI

program here in Dade County . . . .  His hard work and dedication . . . are greatly

appreciated by . . . the State Attorney's Office as a whole," "Having [Pichel] as a witness

is comforting to any Assistant State Attorney . . . .  I welcome any opportunity to have

Officer Pichel on my team," "Officer Pichel voluntarily taught a segment on the

Intoxilyzer, Drug Recognition Experts and Field Sobriety Testing.  The prosecutors were

very impressed with Officer Pichel's obvious expertise and enthusiasm.  He is a credit

to your department," "I am writing to you to formally commend one of the finest officers

I've had the pleasure of working with, Officer Francisco Pichel," "Whenever Sergeant

Pichel is associated with a DUI case, my colleagues and myself are always able to

approach the case with an added sense of confidence," "[Pichel] consistently performs

above and beyond the call of duty. I can't possibly remember the number of times that

I've called him for help on cases that he's only peripherally involved in," "I'm sure that I

can speak for all pit prosecutors when I tell you that Officer Pichel is an outstanding

police officer. He is a credit to your department and law enforcement in general."

      L.    In one notable instance, the State Attorney's office needed last

minute assistance in order to "save a potentially explosive DUI case from being

dismissed." The Assistant State Attorney assigned to the case, which involved an eight

year old accident victim, called Pichel, who came in on his day off to locate critically

necessary paperwork, thereby preventing the case from being dismissed. The

Assistant State Attorney noted that "[i]t was only through [Sgt. Pichel's] assistance that

we were able to successfully prosecute this case."

      M.    On May 2, 1993, Pichel's supervisor commented on his dedication

and significance to the Police Department's DUI program: "Officer Frank Pichel is the

most dedicated and committed officer in combating drunk drivers in the City of Miami

Police Department. . . . Officer Pichel is constantly reviewing all DUI arrests done by

our department for accuracy and completeness. He also assists the State Attorneys'

Office . . . to insure the successful prosecution of everyone we arrest for DUI. . . . He

spends a great deal of his personal time handline the many tasks associated with

handling DUI arrests. . . . Without his commitment and dedication, our efforts would be

greatly undermined. Officer Pichel is an asset to our department and the community."

      N.    In a 1991 trial, Judge Marc Schumacher, speaking from the bench,

"praised Ofcr. Pichel on his reliability and professionalism during previous court cases."

      O.    In 1991, Pichel responded to a smash and grab robbery that left a

newly arrived female Japanese tourist disoriented, and without money, credit cards,

Case No.

identification, airline tickets, passport or accommodations. By immediately placing calls

to his own network of friends, Pichel was able to find the tourist a place to stay with a

fellow female Miami officer. In commending his work, Pichel's supervisor noted that

Pichel's "generosity and human kindness . . . not only reflected upon him, but also upon

the City of Miami Police Department." At the bottom of the commendation, Pichel's

supervisor included a handwritten, personal note: "Frank; your actions are deserving of

commendation and praise. Thanks for caring."

       P.     On June 29, 1988, Pichel received a commendation for searching

out and arresting two burglary suspects who had fled the scene. At the bottom of the

commendation, Lt. Col. Arnold Gibbs inserted a handwritten note praising Pichel's work:

"Officer Pichel is a devoted, hard working employee who always demonstrates a high

level of motivation and initiative. He is a true asset to the Department and a credit to

the police profession. Thanks for your ongoing efforts, Frank."

       Q.     Pichel and two other officers planned, coordinated and hosted the

November 1999 "Police/Community Thanksgiving Holiday Meals" event, which provided

warm meals for economically disadvantaged senior citizens living in the Wynwood area.

       R.     Pichel, along with fellow officers in the Wynwood/Edgewater

Neighborhood Enhancement Team, conducted the first annual Christmas Holiday

Motorized Escort of Santa Claus in December 1998, a program that delivered more

than 200 toys to mothers undergoing drug addition treatment and their children.

       S.     Pichel was one of thirty five officers who donated off-duty hours to

provide security for the 1988 annual "Liga Contra El Cancer" Telethon, which raised

money to fight cancer. Pichel received a commendation, in which his supervisor noted

that "[t]hese officers unselfishly donated their personal time for this important

worthwhile cause.  They represented the City of Miami Police Department proudly and professionally and projected a positive image to the citizens of the City of Miami."

14.    Pichel has received more than one hundred (100) commendations for his outstanding and honorable police work, and for his off-duty service to the community, particularly those sections and segments of it that are in greatest need of attention.

15.    Ironically, the qualities that make Pichel an outstanding officer are what pit him against a gang of powerful, corrupt and grotesquely violent, Miami police officers.

## II.    PICHEL DISCOVERS THE CLIQUE'S CRIMINAL ENTERPRISE.

16.    In the early to mid-Eighties, the City of Miami hired a wave of new police officers in an effort to ease the public's anxiousness about crime.

17.    A group of these new officers were, as noted, corrupt and violent.  These officers, referred to in the Department as the "clique," wore black necked T-shirts to identify each other, and quickly gained influence as its members fanned out into, among other places, the Special Weapons and Tactics Team, (the "SWAT Team"), the Street Narcotics Unit, the Internal Affairs (or "I.A.") Unit, which was responsible for investigating police wrongdoing, the Crime Suppression Unit, and as patrol officers.

18.    Jesse Aguero – who was considered, until he was recently fired, "one of the most notorious cops in the City of Miami," Jim DeFede, *Prosecuting the Police*, New Times, July 27, 2000 – set the tone for the clique.  In his 17 year Police career, Aguero was the subject of 56 I.A. complaints, and he was accused of, among other things, lying under oath, raping a prostitute in his patrol car, helping to cover up the 1988 police beating death of a Wynwood drug dealer, assaulting an NBC 6 cameraman, threatening a Police Sergeant, taking extra ammunition from a Police firearms training range, in case he fired his gun and didn't want to report it, violently assaulting an assistant church

Case 1:01-cv-04756-FAM Document 1 Entered on FLSD Docket 11/27/2001 Page 12 of 44

pastor, and hurling vicious racial slurs at a black supervisor who told him to stop

wearing the clique's trademark black T-shirts, in violation of Police uniform policy.

19.     Defendants knew all about the clique, but instead of weeding out these

corrupt officers, Defendants covered up for them and, indeed, facilitated their behavior.

20.     Specifically, Donald Warshaw (as Police Chief and later as City Manager)

and William O'Brien (as head of the I.A. Unit and later as Police Chief) protected the

clique by stifling, stymying or whitewashing all internal investigations into the clique's

crime spree, and by orchestrating bogus investigations against whistle blowing officers..

**A.     Piggybacking ("Collars for Dollars").**

21.     In 1993, Pichel was assigned to oversee the Department's DUI program.

22.     In this role, Pichel furnished the State Attorneys' Office with paperwork

generated in connection with arrests made at "sobriety roadblocks" throughout the City.

23.     Pichel realized that it was impossible for many of the officers listed as

witnesses on DUI Arrest Affidavits to have actually participated in these arrests, since

they were involved in *other* arrests taking place elsewhere at the same time. Pichel

then discovered that several officers would not show up to court to testify in the DUI

cases where they were listed as witnesses, but they still got paid overtime for it.

24.     Pichel recognized this as "piggybacking" (also referred to as "Collars for

Dollars"), an overtime scam in which officers would list each other as witnesses in drunk

driving cases even if they did little or no police work, so that they could later attend (or

claim to attend) court as witnesses in the trial, and make overtime they didn't deserve.

25.     Pichel confronted the officers who were piggybacking – including the most

egregious offenders, all members of the clique – and told them to stop. Pichel also

attempted to suspend one of these officers, a clique member, from the DUI program.

Case No.

26.    The officers ignored this order, and continued piggybacking in DUI cases.

27.    Pichel reported piggybacking, but Defendants ignored and condoned it.

28.    Indeed, when Pichel reported piggybacking to a Police Lieutenant, the Lieutenant said that he "didn't care what motivated his officers, so long as they made him look good," while the Lieutenant held up his hand, and rubbed his index and middle finger against his thumb.[1]

29.    This Lieutenant's wife, a Police Sergeant, supervised many of the officers who were piggybacking.  When Pichel blew the whistle, the Sergeant told Pichel that she would do "whatever it took" to help the members of the clique involved in the scam.

**B.    Compromising Sworn Duty and Public Trust for Kickbacks.**

30.    Pichel also discovered that a member of the clique was handing out the business card of a criminal defense attorney to those he arrested for drunk driving.

31.    This officer told the arrestee that if he or she hired the that law firm on the card to defend them against the DUI charge, the officer would "help them out" at trial.

32.    As an example of this "help," in July 1996, this officer was under subpoena to attend a driver's license hearing as a witness for the prosecution.

33.    The defendant was a client of this officer's attorney contact.  The officer did not attend the hearing, but he applied, and was paid for, three hours of overtime.

34.    Because the officer did not attend the hearing, the defendant was given his license back, and the case was later dismissed.

35.    The officer claimed that he did not attend the hearing because he was excused by his attorney contact.  The attorney contact admitted "excusing" the officer.

---

[1]    The quoted language in paragraphs 28, 29, 31, 40, 43, 46, 53, 63, 68, 75, 76, 80 and 86 is paraphrased, although in each case the quoted language is either exactly what was said or very nearly so.  The quotation marks are intended to make the narrative understandable.

36.    As the officer and the attorney knew, however, a defense attorney has no authority whatsoever to excuse a properly subpoenaed witness for the prosecution.

37.    Also, this officer sat in on DUI trials where he hadn't made the arrest, but where his attorney contact represented the defendant.  The officer was there, in uniform – in violation of Police policy – to help the attorney contact defeat the charges.

38.    Upon information and belief, this officer received kickbacks for his referrals, and for his lending assistance to the defense attorney.

**C.    Destruction of Evidence Needed to Prosecute Active Criminal Cases.**

39.    Pichel also discovered that, in December 1995, a Lieutenant ordered a subordinate officer to destroy the achieve of nearly 1000 video tapes that the State Attorneys' Office was still actively using to prosecute DUI cases.

40.    If an attorney with the State Attorneys' Office requested a tape, the Lieutenant told the subordinate officer to say that he looked for it, but "couldn't find it."

**D.    Theft.**

41.    In 1996, Pichel caught a member of the clique taking $1,000.00 from a woman that this officer had arrested on a traffic violation.

42.    Pichel found this officer later, in Central Station, counting money he had taken from the woman.

43.    Pichel told him that he wasn't supposed to count the money alone.  In response, the officer said, "who's to say that you and I didn't take the money?"

44.    Pichel brushed past that comment, and stayed with the officer to do an accurate recount of the money.  When the final count came up short, Pichel ordered the officer to put the money into the property unit.

45.     Later that night, this officer asked Pichel to accompany him to the officer's police car.  There, the officer reached into the side pocket of the front passenger door, and pulled out a large wad of money wrapped in rubber bands.

46.     The officer said that the money must have fallen into the pocket while he was driving, and he followed-up this comment up by asking Pichel, "how do we explain this one?"

47.     Pichel ordered the officer to draft a memorandum describing the incident and the officer's version of events.

48.     Pichel reported the incident to his supervisors, but they didn't believe it.

### E.     Manslaughter.

49.     In late 1994, two members of the clique opened fire on a man suspected of snatching a woman's purse.

50.     They missed the suspect, but hit a bystander, who died instantly.

51.     These officers said the suspect was armed, justifying their use of force.

52.     The victim, however, said that her assailant did not have a gun.

53.     Later, these officers bragged about the shooting, telling fellow officers, "fuck him [the bystander] if he got in the way," and that they "didn't care if he's dead."

### F.     Murder; the "Throw Down" Cases.

54.     In a savage spate of killings, officers in the clique shot to death unarmed suspects without justification, then stood ready with a stash of "throwdown" guns to plant on the victims, in order to make it look as though the shootings were justified.

55.     In what is now referred to as the I-395 Throw Down Shooting, Ofcrs. Aguero, Hames, Gonzalez, Mervolion, and Garcia shot and killed two unarmed suspects fleeing from an alleged snatch and grab robbery.

Case No.

56.    To cover it up, the officers planted throwdown guns on the victims.

57.    The officers met later to get their story straight and decide which suspect had a gun.

58.    Immediately afterwards, the Department was buzzing with talk that this was a bad shooting, that a gun was planted, and that the officers involved had concocted a story to cover up the circumstances.

59.    In 1997, in what is now referred to as the Coconut Grove Throw Down Shooting, Ofcr. Aguero shot and killed an unarmed man.

60.    To cover it up, Aguero planted a "throwdown" gun on the victim.

61.    Pichel was on duty the night of the shooting.  Rumors swept through the Department that this was a bad shooting, that a gun had been planted on the victim.

62.    That night, an officer under Pichel's supervision, who was on the scene of the shooting, told Pichel that the rumors were true.

63.    Later that same night, Pichel spoke to another officer, who told him that "[i]t's a mess.  It first looked like a good shooting, but then . . . .  Have you ever gone hunting?  You shine a light on a deer, and it freezes.  That's what Aguero looked like when another officer saw him [lean down and] plant the gun [in the victim's hand]."

64.    A few days later, many members of the clique met in the Department's roll-call room, Central Station, including members of the clique who, at the time, worked for the Department's I.A. Unit and were supposed to be investigating the shooting.

65.    Pichel reported the closed door meeting to Lieutenants in the I.A. Unit. They told Pichel that they would take care of it, but nothing was done.

66.    The clique met again three to four more times to go over their story.

Case No.

67.     During this period, Aguero candidly bragged to fellow officers that he had

a "bulletproof" excuse for why his fingerprints would turn up on the gun allegedly found

on the victim – he would tell investigators that he moved the gun to keep it safe.

68.     Later, when the officer under Pichel's supervision who saw the incident

was interviewed, he changed his story, and told I.A. investigators that he saw nothing.

Afterwards, Pichel asked him why he didn't tell the truth.  The officer told Pichel that

telling the truth wouldn't matter, and could only hurt the person so testifying: "These

people [in the clique] are untouchable.  Look what they've done to you."

## III.     PICHEL'S POLITICAL ACTIVISM AND POLITICAL ASSOCIATIONS.

69.     During this period, Pichel discovered that the Department and the City's

highest ranking officials – Messrs. Warshaw, O'Brien and Carollo, political allies at the

time – were either corrupt themselves, or were aware of departmental corruption, and

were committed to covering it up and punishing inside whistle blowers.[2]

70.     Pichel discovered that Chief Donald Warshaw was corrupt, and that he

used his position to protect the clique and retaliate against inside whistle blowers.

A.     In 1994, Pichel informed Warshaw about the piggybacking scam.

B.     Warshaw asked whether Pichel to take his allegations to I.A.

C.     Pichel agreed, but only if the complaint was not assigned to a

certain I.A. investigator who was a member of the clique, and whose wife, also a police

officer, was personally involved in the scam.

D.     Mr. Warshaw agreed.

---

[2] Years later, Messrs. O'Brien and Warshaw had a very public falling out with Mr. Carollo, after Mr. O'Brien, who was then Police Chief, learned of the raid to remove Elián Gonzalez from his great-uncle's home in Miami, but didn't tell Mr. Carollo about it.  Mr. Carollo ordered Mr. Warshaw to fire Mr. O'Brien.  Mr. Warshaw refused, and Mr. O'Brien resigned.

E.     When Pichel filed his I.A. complaint, it *was* assigned to this I.A. investigator.

F.     As noted, the investigation was a whitewash, and it cleared all the officers under investigation.

G.     In 1996, while Pichel was walking through the Police Station, Mr. Warshaw pointed at him and said to Joe Carollo, "there's the cop who blew the whistle on 'Collars for Dollars.'" Carollo nodded and stared threateningly at Pichel.

H.     Long before it became the subject of newspaper articles and a criminal indictment, Pichel discovered that Mr. Warshaw was stealing from the City.

71.     Pichel discovered that Messrs. O'Brien and Carollo were aware of Departmental corruption, but instead of eliminating it, they used their positions to protect the clique and retaliate against inside whistle blowers.

72.     Because of this, Pichel began supporting causes and candidates that would lessen the influence of Messrs. Warshaw, O'Brien and Carollo on the City.

73.     Aiming to lessen Mr. Warshaw's influence, Pichel vocally supported a "strong mayor" referendum, which, if passed, would transfer the powers of the City Manager, such as the power to hire and fire all department heads, and the power to exercise a line-item veto over the city budget, to the Mayor.

74.     Aiming to lessen Mr. Carollo's influence, Pichel supported Xavier Suarez's candidacy for Mayor.

75.     Pichel also vocally supported Tomas Regalado for City Commissioner. Mr. Regalado, like Pichel, opposed Messrs. Warshaw and Carollo and he, like Pichel, had been harassed by members of the clique, who followed Mr. Regalado, filed false complaints against him, and told him at one point to "watch himself."

76.     Later, a Lieutenant who was, at that time, the executive assistant to

O'Brien, said he would "have a piece of [Pichel's] ass" for supporting Mr. Regalado.

77.     Messrs. Warshaw and O'Brien supported Mr. Carollo, and Messrs.

Warshaw, O'Brien and Carollo opposed the strong mayor referendum and Mr.

Regalado's candidacy.

78.     Defendants knew about Pichel's political activities and his whistle blowing,

and were on a witch hunt to get him because of it.

## IV.  DEFENDANTS' POLICY, OR ITS PERVASIVE CUSTOM AND PRACTICE, OF USING INTERNAL AFFAIRS INVESTIGATIONS AND HARASSMENT TO PROTECT OFFICERS IN THE CLIQUE AND ATTACK WHISTLE BLOWERS.

79.     The clique terrorized officers who blow the whistle on their illegal conduct.

A.      For instance, one officer, who was an I.A. Investigator and a

member of the clique, was walking away from another officer he thought was "ratting on

people" in the clique.  The clique officer said to the whistle blowing officer, "you be

careful on the street."  When the whistle blower confronted him, the clique officer

repeated his threat: "You better watch yourself while you're out on the street."

B.      The clique officer tried to physically intimidate the whistle blower.

C.      In reporting the harassment, the whistle blower said that the clique

officer should not be allowed to remain in the I.A. Unit, "where he can attempt to

intimidate police officers . . . because his close friends are being investigated."

D.      The whistle blower said that allowing the clique officer to remain in

I.A. sends a signal to other officers that "it's pointless to give a statement regarding

unfavorable incidents which may occur in their presence."

Case No.

     E.    In conclusion, the whistle blower pointedly asked, "[h]ow can we as police officers foster the community policing initiative and clean up the community without the support of management?"

    80.   The clique harassed Pichel for blowing the whistle on their illegal conduct:

     A.    Pichel and his wife received dozens of anonymous, threatening phone calls at their home, at all hours of the night: "we're watching you," "we know what school your son goes to," "you'd better watch yourself," "you'd better be careful."

     B.    Pichel's police vehicle was vandalized;

     C.    Pichel received threatening anonymous letters like this one:

> FRANK, IT IS HEAVY NEWS YOU ARE THE ONE WHO IS SPREADING LETTERS. AS YOUR FRIEND, TAKE A LITTLE ADVISE, GIVE UP CAUSE YOU ARE LOOKING LIKE A DOG. THEY HAVE GIVEN YOU A NICKNAMES AS CRYBABY. IF YOU KNOW [SGT.] MARIA [WALTERMAN] LIKE I DO, NOTHING BOTHERS HER. BY THE WAY WHY HAVEN'T YOU CHANGED YOUR ADDRESS IN THE EML. YOU HAVE LIVED HERE FOREVER. CHANGE IT BEFORE YOU GET IN TROUBLE.
>
> A FRIEND AND CO-WORKER

A copy of the anonymous letter is attached as Exhibit "C";

     D.    Clique officers began following Pichel around, neglecting their duties, in order to gather some basis to file bogus I.A. complaints against Pichel.

     E.    For instance, as noted, in 1996, Pichel caught a clique officer sitting in Court, behind his attorney contact, when the clique officer was off-duty and had nothing to do with the case at bar.  As noted, this violates Police policy, since it wrongfully suggests that the Police believe that the defendant should be acquitted. Pichel politely asked that the clique officer leave the courtroom, but did not order him to leave.  The clique officer filed a bogus complaint against Pichel with the I.A. Unit.  But

because the complaint was assigned to an I.A. Investigator who was a fellow member of the clique, it was *Pichel* who was undeservedly disciplined.

81.     Pichel was *not* intimidated by these tactics in any way whatsoever.

82.     Instead, Pichel reported these incidents, involving dozens of clique officers, as well as the clique's broader pattern of illegal conduct, to I.A.  But the complaints were useless, because Defendants had a policy – demonstrated by its consistent, widespread practice – or a pervasive custom and practice, to whitewash internal investigations in order to protect the clique, and to instead use the I.A. Unit to harass, punish and retaliate against inside whistle blowers.

83.     For instance, Pichel was forced to complain several times about the conduct of two clique officers, both I.A. investigators, who rifled through Pichel's in-box and removed personal and official papers from it.

84.     In fact, during this period, documents with Pichel's name on them were also suspiciously removed from the in-box of Pichel's supervisor, Lt. Mario A. Garcia.

85.     In a memorandum complaining about these disappearances, Lt. Garcia noted how this kind of behavior hurt morale: "It is very demoralizing for a supervisor to find out that the officers under his leadership are witnessing this type of behavior."

86.     During the I.A. investigation of the Coconut Grove Throw Down Case, Pichel asked a fellow officer why the clique's closed door meetings were allowed to continue, and why reporting incidents to the I.A. was perceived among officers as such a waste of time.  The officer explained, "Because O'Brien's running Internal Affairs."

## V.   PICHEL REPORTS THIS MISCONDUCT TO THE F.B.I.

87.     No one had a clearer view of (a) the clique's cohesiveness, its criminal enterprise and its violent tendencies and (b) the Department's corruption than did Pichel. Pichel reported the misconduct, first, on several occasions, to the Department's I.A. Unit, and – when that proved to be a waste of time – to the F.B.I.'s Miami office.

88.     During the first meeting, Pichel advised the F.B.I. about the clique, the piggybacking scheme, the kickbacks for referring DUI cases to certain criminal defense attorneys, the use of "throwdown" guns to cover up the I-395 killing, the destruction of evidence, false arrests for DUI, and the unjustified killing of a bystander.

89.     The F.B.I. agents asked Pichel to go to the I.A. Unit with what he knew.

90.     When Pichel told the agents that Defendants used the I.A. Unit to whitewash investigations and to harass and retaliate against inside whistle blowers, the agents, like Captain Renault in the film *Casablanca*, professed to be "shocked, shocked" that either Messrs. Warshaw or O'Brien were involved in any way whatsoever.

91.     The F.B.I. agents told Pichel that Messrs. O'Brien and Warshaw couldn't have anything to do with it, since, in one agent's words, O'Brien and Warshaw were appointed to clean up the Department, not stain it. With that, the first meeting ended.

92.     At the second meeting, the first issue Pichel addressed was why he came back to see the F.B.I. Pichel explained that he had been approached in a gym by one of the Miami River Cops, who had just been paroled after serving a prison sentence.

93.     Pichel didn't know this River Cop well, and he politely tried to end the conversation. But the River Cop was anxious to reconnect with officers in the community, and in pushing the conversation forward, he told Pichel about a number of other incidents of corruption and misconduct by the clique and other officers that Pichel

Case No.

had not been aware of, including officers (i) conspiring to traffic cocaine from Santo Domingo, (ii) covering up shootings and murders, (iii) using cocaine, and (iv) conducting home invasion robberies of drug traffickers and taking money from drug offenders, who would not likely complain about it, for fear of an inquiry into how they got the money.

94.    Now burdened with this information, Pichel took it to his supervisor, and asked what he should do. Pichel's supervisor told him that he had to go to the State Attorneys' Office and to the F.B.I. with what he learned.

95.    Pichel then went to the State Attorneys' Office, and then to the F.B.I., with the hope of exposing, and thereby weeding out, corruption in the Department.

96.    The F.B.I. agents told Pichel that they had heard all these accusations before, that Messrs. O'Brien and Warshaw were "good guys" who would not tolerate a criminal enterprise in the Department, and that Pichel's allegations sounded like they were lifted from the movie "CopLand." With that, the second meeting ended.

97.    The third meeting took place earlier this year, after a tsunamic wave of evidence washed ashore, all of which suggested that the I-395 and Coconut Grove shootings were murders, committed by the clique, followed by an organized cover up. This time, when Pichel met with F.B.I. agents, they apologized for ignoring Pichel's earlier allegations, and vowed to thoroughly investigate what he told them.

98.    Unfortunately for Pichel, news of his meetings with the F.B.I. leaked to members of the clique.

99.    Refusing to "play ball" with corrupt officers, blowing the whistle on the clique, expressing his views on hot local political issues and affiliating himself with particular political candidates has, for years, put Pichel in the cross hairs of the clique

and the Department that has so systematically covered up their criminal behavior. In

2000, the Department finally found a way to retaliate against Pichel. And it did so.

## V.   DEFENDANTS RETALIATE AGAINST PICHEL.

100.   On April 10, 2000, Pichel was the supervisor in charge of a crime

suppression detail in the Wynwood area. During the detail that day, Elew Collazo was

arrested for possession of cocaine. While in the police mini-station in Wynwood, Mr.

Collazo was allegedly struck by former Ofcr. Carlos Rivera, an officer involved in the

crime suppression detail. Presumably as a result of whatever blow(s) Ofcr. Rivera

delivered to Mr. Collazo, Mr. Collazo died a week later while in jail.

101.   On April 19, 2000, Pichel was relieved of duty with pay while the State

Attorney's Office investigated the circumstances surrounding Mr. Collazo's death.

Within 48 hours, the homicide division of the City of Miami Police Department had

interviewed all the witnesses to the events which transpired within the mini-station on

April 10th. Although Pichel was willing to give a statement to investigators at that time,

Lt. John Campbell refused to take Sgt. Pichel's statement.

102.   Upon the completion of this initial investigation, the Department knew:

A.   Pichel had not delivered *any* blows to Mr. Collazo;

B.   Pichel had not made any oral comments indicating he was aware

that Ofcr. Rivera had delivered any blows to Mr. Collazo;

C.   Pichel had taken pictures of Mr. Collazo when Mr. Collazo

complained of pain in his mid-section, but no injury was noticeable on Mr. Collazo's

body;

D.   Pichel had ordered Mr. Collazo transported to Ward "D" at Jackson

Memorial Hospital despite the lack of evidence of any injury;

E.    Pichel had asked that an injury report be created based on Mr. Collazo's complaint despite the lack of evidence of any injury.

103.   Had the investigators' questioning focused on Pichel's knowledge of Ofcr. Rivera's actions, they would have also learned that:

A.    Pichel had ordered Ofcr. Rivera to step away from Mr. Collazo when Ofcr. Rivera looked about to lose control, and Pichel physically pushed Ofcr. Rivera away from Mr. Collazo;

B.    Pichel asked Ofcr. Rivera if he had struck Mr. Collazo, and Ofcr. Rivera vehemently denied it.

104.   Despite the lack of evidence of Pichel's involvement in the fatal blow delivered to Mr. Collazo, Defendants relieved Pichel of duty pending an I.A. "inquiry."

105.   O'Brien, by then the Police Chief and the person who made the decision to relieve Pichel of duty, immediately went on a media junket, granting media interviews in which he maliciously pronounced Pichel guilty and the relief of duty appropriate.

106.   O'Brien has never gone on such a media junket before or since.

107.   When he has commented publically in other cases, it was to offer his official support for the officer under investigation.

108.   O'Brien's "media junket" was part of Defendants' retaliation against Pichel.

109.   The "inquiry" has been going on now for sixteen (16) months.

110.   Even today, after the State Attorney's Office long ago declined to prosecute him on any criminal charges stemming from Mr. Collazo's death, Pichel remains relieved of duty while I.A. continues its perpetual investigation into the matter.

111.    In fact, this "inquiry" is nothing more than a pretext.  The unlawful adverse personnel action taken against Pichel was and is part of a continuing practice of retaliation against him for his whistle-blowing and constitutionally protected activities.

112.    Supporting this contention is the long list of other officers who have been suspected of *far worse acts*, have not been relieved of duty.  Here are some examples:

A.    Ofcrs. Aguero, Garcia, Gonzalez, Beguiristain, Quintero, Castello, Acuna, Lopez, Fuentes, Ronda, Hames and Mervolion were not even reassigned to desk jobs, much less relieved of duty, during the lengthy investigation that eventually led to their indictment for murder in connection with the I-395 and Coconut Grove Throw Down Cases, until Channel 4 News created a stir about the situation;

B.    The Lieutenant who intentionally destroyed evidence was not even reassigned to a desk job, much less relieved of duty, during the investigation;

C.    This same Lieutenant was allowed to return to work at his actual assignment after he was arrested for domestic violence;

D.    Ofcrs. Acuna, Fuentes, Beguiristain, Lopez and Macias, were merely relieved of S.W.A.T. duty, but not active duty, during the investigation into the 1996 shooting death of Richard O. Brown, a 72 year old man who was fired on by these officers 122 times during a drug raid, even though the federal agencies investigating the shooting told the Police Chief that more indictments would soon be handed down.

E.    During the investigation of the "John Does," a violent drug gang, at least three officers were intercepted on wiretaps talking to and setting up meetings with the gang's leaders.  Two years later, those officers remain on the job;

F.    A female officers telephone number was "trapped" by Police surveillance equipment in the phone of a high-ranking member of the John Does.  The

Case No.

Police had reason to believe the two had a personal relationship, and Police

eavesdropping on conversations heard gang members discussing her by name.  This

information was passed to the I.A. Unit, which, two years later, has not followed up.

The officer is still on patrol in the same district;

        G.    A former north district Sergeant, who was implicated by an

anonymous phone call that led to the discovery of a cache of drugs, was once involved

in a standoff with Police officers responding to his home after his wife called for help,

claiming he was beating her.  He's since been promoted to Lieutenant;

        H.    An officer was not relieved of duty after two officers reported him

for assaulting a prisoner.  This officer was later allowed to retire.

### COUNT I – CLAIM PURSUANT TO 42 U.S.C. § 1983 FOR RETALIATION AGAINST PICHEL'S EXERCISING HIS RIGHT TO SPEAK FREELY ON ISSUES OF PUBLIC CONCERN (AGAINST THE CITY)

Paragraphs 1 through 112 are incorporated herein by reference.

113.    On April 19, 2000, Pichel was a public employee employed by the City.

114.    Pichel's whistle blowing to the F.B.I. concerning the clique's criminal

misconduct constitutes speech on a matter of public concern.  *See Cooper v. Smith*, 89

F.3d 761, 765 (11th Cir. 1996) ("There can be no doubt that corruption in a police

department is an issue of public concern.").

115.    Furthermore, Pichel was speaking as a citizen on behalf of the public, and

not as an employee to further his own private interests.

116.    Pichel's First Amendment interests outweigh Defendants interests in

promoting the efficiency of public services.  Indeed, by Defendants' admission, no

interest outweighs efforts to smoke out police corruption.  *See D. Green, Chief Defends

Results of Department's Internal Inquiries*, Miami Herald, March 15, 2001 ("'Nobody

wants these few bad apples out of here more than we do,' [current Police Chief Raul]

Martinez said. . . .").

117.   Being suspended from duty constitutes an adverse employment action.

118.   Pichel's speech played a substantial – indeed, an overriding – part in the

adverse employment action taken against him.

119.   The City is liable for this constitutional deprivation:

A.   O'Brien was the Chief of Police for the City of Miami Police

Department – and acting under color of the laws and regulations of the State of Florida

and the City of Miami – when he deprived Pichel of his rights under the First and

Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C. §

1983. O'Brien was the final policymaker for the City with respect to the action at issue.

B.   The City had a policy – demonstrated by its consistent, widespread

practice – or a pervasive custom or practice, to use internal investigations to harass,

punish and retaliate against inside whistle blowers, such as Pichel.

120.   As a direct and proximate result of Defendants' acts, Pichel suffered the

following injuries and damages:

A.   lost earnings;

B.   damage to future earning capacity;

C.   damage to reputation in the past and future;

D.   mental anguish in the past and future; and

E.   damage to pension or retirement benefits.

121.   It was necessary for Pichel to hire the undersigned counsel to file this

lawsuit. Upon judgment, Pichel is entitled to an award of attorney's fees and costs

under 42 U.S.C. § 1988.

122.   For these reasons, Pichel asks for judgment against the City for actual or

compensatory damages, reasonable attorney's fees, prejudgment and post-judgment

interest, costs of suit, reinstatement, and any other relief the Court deems appropriate.

### COUNT II – CLAIM PURSUANT TO 42 U.S.C. § 1983 FOR
### RETALIATION AGAINST PICHEL'S EXERCISING HIS RIGHT TO
### SPEAK FREELY ON ISSUES OF PUBLIC CONCERN (AGAINST O'BRIEN)

Paragraphs 1 through 112 are incorporated herein by reference.

123.   On April 19, 2000, Pichel was a public employee employed by the City.

124.   Pichel's whistle blowing to the F.B.I. concerning the clique's criminal

misconduct constitutes speech on a matter of public concern.  *See Cooper v. Smith*, 89

F.3d 761, 765 (11th Cir. 1996) ("There can be no doubt that corruption in a police

department is an issue of public concern.").

125.   Furthermore, Pichel was speaking as a citizen on behalf of the public, and

not as an employee to further his own private interests.

126.   Pichel's First Amendment interests outweigh Defendants interests in

promoting the efficiency of public services.  Indeed, by Defendants' admission, no

interest outweighs efforts to smoke out police corruption.  *See* D. Green, *Chief Defends*

*Results of Department's Internal Inquiries*, Miami Herald, March 15, 2001 ("'Nobody

wants these few bad apples out of here more than we do,' [current Police Chief Raul]

Martinez said. . . .").

127.   Being suspended from duty constitutes an adverse employment action.

128.   Pichel's speech played a substantial – indeed, an overriding – part in the

adverse employment action taken against him.

129.   O'Brien is liable for this constitutional deprivation.  O'Brien was the Chief

of Police for the City of Miami Police Department – and acting under color of the laws

and regulations of the State of Florida and the City of Miami – when he deprived Pichel

of his rights under the First and Fourteenth Amendment to the United States

Constitution, in violation of 42 U.S.C. § 1983. O'Brien was the final policymaker for the

City with respect to the action at issue.

130.    As a direct and proximate result of Defendants' acts, Pichel suffered the

following injuries and damages:

A.      lost earnings;

B.      damage to future earning capacity;

C.      damage to reputation in the past and future;

D.      mental anguish in the past and future; and

E.      damage to pension or retirement benefits.

131.    The conduct of O'Brien demonstrated conscious indifference toward the

rights of Pichel. The intentional, malicious, and willful nature of such conduct by

O'Brien, and the conscious disregard of Pichel's rights and welfare support the

imposition of punitive damages.

132.    It was necessary for Pichel to hire the undersigned counsel to file this

lawsuit. Upon judgment, Pichel is entitled to an award of attorney's fees and costs

under 42 U.S.C. § 1988.

133.    For these reasons, Pichel asks for judgment against the City for actual or

compensatory damages, reasonable attorney's fees, prejudgment and post-judgment

interest, costs of suit, reinstatement, and any other relief the Court deems appropriate.

Case No.

## COUNT III – CLAIM PURSUANT TO 42 U.S.C. § 1983 FOR RETALIATION AGAINST PICHEL'S EXERCISING HIS RIGHT TO FREELY ASSOCIATE (POLITICAL PATRONAGE CLAIM AGAINST THE CITY)

Paragraphs 1 through 112 are incorporated herein by reference.

134.    On April 19, 2000, Pichel was a public employee employed by the City.

135.    Pichel supported a strong mayor system and Xavier Suarez and Thomas Regalado, and opposed Joe Carollo and Donald Warshaw and William O'Brien.  This all represents Pichel's constitutionally protected political affiliations and beliefs.

136.    The City, at the time, opposed a strong mayor system and Xavier Suarez and Thomas Regalado, and supported Donald Warshaw.

137.    Pichel actually suffered adverse employment action, when the City relieved him of duty in retaliation for his protected political affiliations and beliefs.

138.    Party affiliation is not important to the effective performance of Pichel's job

139.    The City is liable for this constitutional deprivation:

        A.      O'Brien was the Chief of Police for the City of Miami Police Department – and acting under color of the laws and regulations of the State of Florida and the City of Miami – when he deprived Pichel of his rights under the First and Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C. § 1983.  O'Brien was the final policymaker for the City with respect to the action at issue.

        B.      The City had a policy – demonstrated by its consistent, widespread practice – or a pervasive custom or practice, to use internal investigations to harass, punish and retaliate against those who vocally supported political causes, parties and politicians opposed by the City and the Department's highest ranking officials.

140.    As a direct and proximate result of Defendants' acts, Pichel suffered the following injuries and damages:

    A.     lost earnings;

    B.     damage to future earning capacity;

    C.     damage to reputation in the past and future;

    D.     mental anguish in the past and future; and

    E.     damage to pension or retirement benefits.

141.   It was necessary for Pichel to hire the undersigned counsel to file this lawsuit.  Upon judgment, Pichel is entitled to an award of attorney's fees and costs under 42 U.S.C. § 1988.

142.   For these reasons, Pichel asks for judgment against the City for actual or compensatory damages, reasonable attorney's fees, prejudgment and post-judgment interest, costs of suit, reinstatement, and any other relief the Court deems appropriate.

### COUNT IV – CLAIM PURSUANT TO 42 U.S.C. § 1983 FOR RETALIATION AGAINST PICHEL'S EXERCISING HIS RIGHT TO FREELY ASSOCIATE (POLITICAL PATRONAGE CLAIM AGAINST O'BRIEN)

Paragraphs 1 through 112 are incorporated herein by reference.

143.   On April 19, 2000, Pichel was a public employee employed by the City.

144.   Pichel supported a strong mayor system and Xavier Suarez and Thomas Regalado, and opposed Joe Carollo and Donald Warshaw and William O'Brien.  This all represents Pichel's constitutionally protected political affiliations and beliefs.

145.   O'Brien, at the time, opposed a strong mayor system and Xavier Suarez and Thomas Regalado, and supported Joe Carollo and Donald Warshaw.

146.   Pichel actually suffered adverse employment action, when the City relieved him of duty in retaliation for his protected political affiliations and beliefs.

147.   Party affiliation is not important to the effective performance of Pichel's job

Case No.

148.   O'Brien is liable for this constitutional deprivation.  O'Brien was the Chief

of Police for the City of Miami Police Department -- and acting under color of the laws

and regulations of the State of Florida and the City of Miami -- when he deprived Pichel

of his rights under the First and Fourteenth Amendment to the United States

Constitution, in violation of 42 U.S.C. § 1983.  O'Brien was the final policymaker for the

City with respect to the action at issue.

149.   As a direct and proximate result of Defendants' acts, Pichel suffered the

following injuries and damages:

>   A.   lost earnings;
>
>   B.   damage to future earning capacity;
>
>   C.   damage to reputation in the past and future;
>
>   D.   mental anguish in the past and future; and
>
>   E.   damage to pension or retirement benefits.

150.   The conduct of O'Brien demonstrated conscious indifference toward the

rights of Pichel.  The intentional, malicious, and willful nature of such conduct by

O'Brien, and the conscious disregard of Pichel's rights and welfare support the

imposition of punitive damages.

151.   It was necessary for Pichel to hire the undersigned counsel to file this

lawsuit.  Upon judgment, Pichel is entitled to an award of attorney's fees and costs

under 42 U.S.C. § 1988.

152.   For these reasons, Pichel asks for judgment against the City for actual or

compensatory damages, reasonable attorney's fees, prejudgment and post-judgment

interest, costs of suit, reinstatement, and any other relief the Court deems appropriate.

Case No.

## COUNT V – CLAIM PURSUANT TO 42 U.S.C. § 1983 FOR FAILURE TO PROVIDE EQUAL PROTECTION UNDER THE LAW (AGAINST THE CITY)

Paragraphs 1 through 112 are incorporated herein by reference.

153.   On April 19, 2000, Pichel was a public employee employed by the City.

154.   By relieving Pichel of duty on a pretext, when its real motivation was to retaliate against Pichel for engaging in whistle blowing and political activities, the City has taken official action that is not rationally related to a legitimate government interest.

155.   The City is liable for this constitutional deprivation:

A.   O'Brien was the Chief of Police for the City of Miami Police Department – and acting under color of the laws and regulations of the State of Florida and the City of Miami – when he deprived Pichel of his rights under the First and Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C. § 1983. O'Brien was the final policymaker for the City with respect to the action at issue.

B.   The City had a policy – demonstrated by its consistent, widespread practice – or a pervasive custom or practice, to treat inside whistle blowers and those endorsing contrary political views unlike, and comparatively worse, than other officers.

156.   As a direct and proximate result of Defendants' acts, Pichel suffered the following injuries and damages:

A.   lost earnings;

B.   damage to future earning capacity;

C.   damage to reputation in the past and future;

D.   mental anguish in the past and future; and

E.   damage to pension or retirement benefits.

157.   It was necessary for Pichel to hire the undersigned counsel to file this lawsuit.  Upon judgment, Pichel is entitled to an award of attorney's fees and costs under 42 U.S.C. § 1988.

158.   For these reasons, Pichel asks for judgment against the City for actual or compensatory damages, reasonable attorney's fees, prejudgment and post-judgment interest, costs of suit, reinstatement, and any other relief the Court deems appropriate.

## COUNT VI – CLAIM PURSUANT TO 42 U.S.C. § 1983 FOR FAILURE TO PROVIDE EQUAL PROTECTION UNDER THE LAW (AGAINST O'BRIEN)

Paragraphs 1 through 112 are incorporated herein by reference.

159.   On April 19, 2000, Pichel was a public employee employed by the City.

160.   By relieving Pichel of duty on a pretext, when its real motivation was to retaliate against Pichel for engaging in whistle blowing and political activities, the City has taken official action that is not rationally related to a legitimate government interest.

161.   O'Brien is liable for this constitutional deprivation.  O'Brien was the Chief of Police for the City of Miami Police Department – and acting under color of the laws and regulations of the State of Florida and the City of Miami – when he deprived Pichel of his rights under the First and Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C. § 1983.  O'Brien was the final policymaker for the City with respect to the action at issue.

162.   As a direct and proximate result of Defendants' acts, Pichel suffered the following injuries and damages:

A.   lost earnings;

B.   damage to future earning capacity;

C.   damage to reputation in the past and future;

D.    mental anguish in the past and future; and

E.    damage to pension or retirement benefits.

163.    The conduct of O'Brien demonstrated conscious indifference toward the rights of Pichel.  The intentional, malicious, and willful nature of such conduct by O'Brien, and the conscious disregard of Pichel's rights and welfare support the imposition of punitive damages.

164.    It was necessary for Pichel to hire the undersigned counsel to file this lawsuit.  Upon judgment, Pichel is entitled to an award of attorney's fees and costs under 42 U.S.C. § 1988.

165.    For these reasons, Pichel asks for judgment against the City for actual or compensatory damages, reasonable attorney's fees, prejudgment and post-judgment interest, costs of suit, reinstatement, and any other relief the Court deems appropriate.

### COUNT VII – CLAIM PURSUANT TO 42 U.S.C. § 1983 FOR WRONGFULLY BURDENING CONSTITUTIONAL RIGHTS (GENERAL STRICT SCRUTINY CLAIM AGAINST THE CITY)

Paragraphs 1 through 112 are incorporated herein by reference.

166.    On April 19, 2000, Pichel was a public employee employed by the City.

167.    By relieving Pichel of duty on a pretext, when its real motivation was to retaliate against Pichel for engaging in whistle blowing and political activities, the City has burdened Pichel's fundamental constitutional rights. *Bryson v. City of Waycross*, 888 F.2d 1562, 1566 (11th Cir. 1989) ("a core concern of the first amendment is the protection of the 'whistle-blower' attempting to expose government corruption.").

168.    Such a burden is analyzed under the strictest scrutiny, and it may only be upheld if the burden is narrowly tailored to serve a compelling government interest.

169.    The City cannot make the requisite showing here.

170.   The City is liable for this constitutional deprivation:

A.   O'Brien was the Chief of Police for the City of Miami Police Department – and acting under color of the laws and regulations of the State of Florida and the City of Miami – when he deprived Pichel of his rights under the First and Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C. § 1983. O'Brien was the final policymaker for the City with respect to the action at issue.

B.   The City had a policy – demonstrated by its consistent, widespread practice – or a pervasive custom or practice, to use internal investigations to harass, punish and retaliate against officers like Pichel, who are inside whistle blowers and who vocally support issues and associate with parties or causes that the City opposes.

171.   As a direct and proximate result of Defendants' acts, Pichel suffered the following injuries and damages:

A.   lost earnings;

B.   damage to future earning capacity;

C.   damage to reputation in the past and future;

D.   mental anguish in the past and future; and

E.   damage to pension or retirement benefits.

172.   It was necessary for Pichel to hire the undersigned counsel to file this lawsuit. Upon judgment, Pichel is entitled to an award of attorney's fees and costs under 42 U.S.C. § 1988.

173.   For these reasons, Pichel asks for judgment against the City for actual or compensatory damages, reasonable attorney's fees, prejudgment and post-judgment interest, costs of suit, reinstatement, and any other relief the Court deems appropriate.

## COUNT VIII – CLAIM PURSUANT TO 42 U.S.C. § 1983 FOR WRONGFULLY BURDENING CONSTITUTIONAL RIGHTS (GENERAL STRICT SCRUTINY CLAIM AGAINST O'BRIEN)

Paragraphs 1 through 112 are incorporated herein by reference.

174.   On April 19, 2000, Pichel was a public employee employed by the City.

175.   By relieving Pichel of duty on a pretext, when its real motivation was to retaliate against Pichel for engaging in whistle blowing and political activities, the City has burdened Pichel's fundamental constitutional rights. *Bryson v. City of Waycross*, 888 F.2d 1562, 1566 (11th Cir. 1989) ("a core concern of the first amendment is the protection of the 'whistle-blower' attempting to expose government corruption.").

176.   Such a burden is analyzed under the strictest scrutiny, and it may only be upheld if the burden is narrowly tailored to serve a compelling government interest.

177.   The City cannot make the requisite showing here.

178.   O'Brien is liable for this constitutional deprivation.  O'Brien was the Chief of Police for the City of Miami Police Department – and acting under color of the laws and regulations of the State of Florida and the City of Miami – when he deprived Pichel of his rights under the First and Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C. § 1983.  O'Brien was the final policymaker for the City with respect to the action at issue.

179.   As a direct and proximate result of Defendants' acts, Pichel suffered the following injuries and damages:

      A.     lost earnings;

      B.     damage to future earning capacity;

      C.     damage to reputation in the past and future;

      D.     mental anguish in the past and future; and

       E.     damage to pension or retirement benefits.

180.   The conduct of O'Brien demonstrated conscious indifference toward the rights of Pichel.  The intentional, malicious, and willful nature of such conduct by O'Brien, and the conscious disregard of Pichel's rights and welfare support the imposition of punitive damages.

181.   It was necessary for Pichel to hire the undersigned counsel to file this lawsuit.  Upon judgment, Pichel is entitled to an award of attorney's fees and costs under 42 U.S.C. § 1988.

182.   For these reasons, Pichel asks for judgment against the City for actual or compensatory damages, reasonable attorney's fees, prejudgment and post-judgment interest, costs of suit, reinstatement, and any other relief the Court deems appropriate.

### COUNT IX – CLAIM PURSUANT TO 42 U.S.C. § 1983 FOR VIOLATING PICHEL'S SUBSTANTIVE DUE PROCESS RIGHTS (AGAINST CITY)

Paragraphs 1 through 112 are incorporated herein by reference. .

183.   On April 19, 2000, Pichel was a public employee employed by the City.

184.   By retaliating against Pichel for his blowing the whistle on the clique's pervasive, rampant corruption and lawless, gruesome violence, the City engaged in an action that shocks the conscience, and offends the cannons of decency and fairness.

185.   The City is liable for this constitutional deprivation:

       A.     O'Brien was the Chief of Police for the City of Miami Police Department – and acting under color of the laws and regulations of the State of Florida and the City of Miami – when he deprived Pichel of his rights under the First and Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C. § 1983.  O'Brien was the final policymaker for the City with respect to the action at issue.

   B.     The City had a policy – demonstrated by its consistent, widespread

practice – or a pervasive custom or practice, to use internal investigations to harass,

punish and retaliate against inside whistle blowers, such as Pichel.

   186.   As a direct and proximate result of Defendants' acts, Pichel suffered the

following injuries and damages:

   A.     lost earnings;

   B.     damage to future earning capacity;

   C.     damage to reputation in the past and future;

   D.     mental anguish in the past and future; and

   E.     damage to pension or retirement benefits.

   187.   It was necessary for Pichel to hire the undersigned counsel to file this

lawsuit.  Upon judgment, Pichel is entitled to an award of attorney's fees and costs

under 42 U.S.C. § 1988.

   188.   For these reasons, Pichel asks for judgment against the City for actual or

compensatory damages, reasonable attorney's fees, prejudgment and post-judgment

interest, costs of suit, reinstatement, and any other relief the Court deems appropriate.

**COUNT X – CLAIM PURSUANT TO 42 U.S.C. § 1983 FOR VIOLATING
PICHEL'S SUBSTANTIVE DUE PROCESS RIGHTS (AGAINST O'BRIEN)**

Paragraphs 1 through 112 are incorporated herein by reference.

   189.   On April 19, 2000, Pichel was a public employee employed by the City.

   190.   By retaliating against Pichel for his blowing the whistle on the clique's

pervasive, rampant corruption and lawless, gruesome violence, the City engaged in an

action that shocks the conscience, and offends the cannons of decency and fairness.

191.  O'Brien is liable for this constitutional deprivation.  O'Brien was the Chief

of Police for the City of Miami Police Department – and acting under color of the laws

and regulations of the State of Florida and the City of Miami – when he deprived Pichel

of his rights under the First and Fourteenth Amendment to the United States

Constitution, in violation of 42 U.S.C. § 1983.  O'Brien was the final policymaker for the

City with respect to the action at issue.

192.  As a direct and proximate result of Defendants' acts, Pichel suffered the

following injuries and damages:

> A.    lost earnings;
>
> B.    damage to future earning capacity;
>
> C.    damage to reputation in the past and future;
>
> D.    mental anguish in the past and future; and
>
> E.    damage to pension or retirement benefits.

193.  The conduct of O'Brien demonstrated conscious indifference toward the

rights of Pichel.  The intentional, malicious, and willful nature of such conduct by

O'Brien, and the conscious disregard of Pichel's rights and welfare support the

imposition of punitive damages.

194.  It was necessary for Pichel to hire the undersigned counsel to file this

lawsuit.  Upon judgment, Pichel is entitled to an award of attorney's fees and costs

under 42 U.S.C. § 1988.

195.  For these reasons, Pichel asks for judgment against the City for actual or

compensatory damages, reasonable attorney's fees, prejudgment and post-judgment

interest, costs of suit, reinstatement, and any other relief the Court deems appropriate.

Case No.

## COUNT XI – CLAIM PURSUANT TO 42 U.S.C. § 1985(3) FOR
## INVIDIOUS CLASS-BASED DISCRIMINATION (AGAINST DEFENDANTS)

Paragraphs 1 through 112 are incorporated herein by reference.

196.  Two or more persons, including Defendants, conspired to deprive Pichel, and a class of all officers who blew the whistle on Police corruption, of the equal protections of the laws, or of equal privileges and immunities under the laws.

197.  The actions of the conspirators were motivated by an invidiously discriminatory animus against Pichel as an inside Police whistle blower.

198.  Such whistle blowers are a class of persons that need special assistance in protecting their rights.

199.  One or more of the conspirators acted in furtherance of the conspiracy.

200.  As a result of the conspiracy, Pichel has been injured in his property, by being relieved of duty as a pretext for his whistle blowing on departmental corruption, and been deprived of having and exercising his rights or privileges.

201.  It was necessary for Pichel to hire the undersigned counsel to file this lawsuit.  Upon judgment, Pichel is entitled to an award of attorney's fees and costs under 42 U.S.C. § 1988.

202.   For these reasons, Pichel asks for judgment against the City for actual or compensatory damages, reasonable attorney's fees, prejudgment and post-judgment interest, costs of suit, reinstatement, and any other relief the Court deems appropriate.

**DATED:** October 26, 2001.

> **DE LA O & MARKO**
> Attorneys for Plaintiff
> 3001 S.W. 3rd Avenue
> Miami, Florida 33129
> Telephone: (305) 285-2000
> Facsimile:  (305) 285-5555
>
> By: _____
> **Miguel M. de la O**
> Florida Bar No. 0822700
> delao@delao-marko.com
> **Daniel L. Leyton**
> Florida Bar No. 0061824
> leyton@delao-marko.com

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**01 4756**

## I (a) PLAINTIFFS

FRANCISCO PICHEL

## DEFENDANTS

CITY OF MIAMI, FLORIDA,
WILLIAM O'BRIEN

**CIV-MORENO**

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF MIAMI-DADE
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT MIAMI-DADE
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.    DUBÉ

A-Dade   01- 4756 CIV FAM/Dube

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Miguel M. de la O, Esq.
3001 S.W. Third Avenue
Miami, Florida 33129 (305) 285-5555

ATTORNEYS (IF KNOWN)
Stephen Scott, Asst. City Attorney
444 S.W. 2nd Avenue, Ste. #945
Miami, Florida 33130-1910 (305) 416-1800

**NIGHT BOX FILED**

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:
DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

NOV 21 2001

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

## II. BASIS OF JURISDICTION   (PLACE AN × IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES   (PLACE AN × IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION   (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE

DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

IVa.   10  days estimated (for both sides) to try entire case.

## V. NATURE OF SUIT   (PLACE AN × IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| A ☐ 110 Insurance<br>A ☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>B ☐ 151 Medicare Act<br>B ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>B ☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury – Med Malpractice<br>☐ 365 Personal Injury – Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>B ☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | A ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>A ☐ 690 Other | A ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>B ☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>B ☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 441 Voting<br>☒ 442 Employment<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | **B PRISONER PETITIONS**<br>☐ 510 Motions to Vacate Sentence<br>Habeas Corpus<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS – Third Party 26 USC 7609 |  |

## VI. ORIGIN   (PLACE AN × IN ONE BOX ONLY)

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Refiled
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

**DEMAND $**

Check YES only if demanded in complaint:
**JURY DEMAND:**   ☒ YES   ☐ NO

## VIII. RELATED CASE(S) IF ANY   (See instructions)

JUDGE _____   DOCKET NUMBER _____

DATE
11-21-01

SIGNATURE OF ATTORNEY OF RECORD
_[signature]_

UNITED STATES DISTRICT COURT
S/F   I-2

FOR OFFICE USE ONLY:   Receipt No. 85321
Date Paid: 11/21/01
Amount: $150.00
M/ifp: